# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No.  13-109-03/04 (ESH) |
| | : | |
| v. | : | |
| | : | |
| **DARIUS MCKEEVER,** | : | |
| **KENNETH BENNY-DEAN,** | : | |
| Defendants. | : | |

## GOVERNMENT'S COMBINED OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following combined opposition to defendants' pretrial motions. As grounds for this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing on the motions:

## SUMMARY OF FACTS

On April 4, 2013, undercover officers from the Metropolitan Police Department NSID and Special Agents of the Federal Bureau of Investigation concluded an investigation into the defendants and their co-defendants who were  involved in planning a violent robbery.  After multiple previous meetings with undercover officers prior to the arrests, co-defendant Trevor Hopkins, and at times defendant Darius McKeever, and/or co-defendant Darnell Wallace met with undercover officers. Specifically, on April 4, 2013, co-defendant Hopkins agreed to bring three others to meet at 175 R Street NE.  At 8:46 p.m., defendants Benny-Dean, and Darius McKeever, co-defendants Trevor Hopkins, and Darnell Wallace arrived in a Nissan Maxima.  Co-defendant Hopkins was driving, defendant McKeever was in the front passenger seat, and defendant Benny-Dean and co-defendant

1

Wallace were in the back seat. The location was a storage facility, where an undercover officer met defendants at their vehicle and greeted them. The undercover officer asked both co-defendants Hopkins and Wallace to sit down in the undercover vehicle to look at two firearms. Co-defendant Hopkins had previously spoken to the undercover officer and asked the officer to provide firearms for the robbery. Inside the vehicle, the undercover officer showed co-defendant Hopkins a Sig Sauer 9mm pistol. Co-defendant Hopkins looked at the gun checking it to make sure the handgun worked. Co-defendant Wallace was seated in the back and also handled the 9mm pistol. The undercover officer showed both co-defendants an AK 47 assault weapon. Both co-defendants looked at the rifle and co-defendant Wallace held it and checked it to see if it functioned. The undercover officer then told them to go upstairs to meet with other officers who were acting as criminals participants.

All four defendants went into the storage room and sat down on two couches, where an undercover officer showed co-defendant Hopkins a curling iron as they began to talk. Co-defendant Hopkins had previously spoken to the undercover officers earlier and stated that if the victim of the robbery refused to provide the combination to the safe co-defendant Hopkins would use a curling iron to torture him until he got the combination and that he would use the curling iron to burn the inner thigh of the victim. Co-defendant Wallace said they would also put it on the victim's penis if they needed to. At that time, the undercover officer and the four defendants discussed the details of the robbery. Co-defendant Wallace spoke repeatedly about murdering the victim if necessary. Defendant McKeever took a roll of duct tape to use in the robbery. Co-defendant Hopkins instructed McKeever to wipe off any prints on the duct tape and instructed the undercover officer to wipe his prints off the curling iron. Defendants Benny-Dean and McKeever listened to the undercover discuss the details of the robbery. When co-defendant Wallace asked if there was bullet-proof glass

protecting the victim in his business, the undercover officer stated "no but couldn't remember what type of glass." Defendant Benny-Dean suggested it might be plexi-glass and defendant McKeever asked if there was a second floor to the victims location and the size of the store. The four defendants all agreed to the robbery after hearing the details, even toasting to the plan. Subsequently, the undercover officer then opened the door to the storage unit and the MPD Emergency Response Team placed the four defendants under arrest without incident. Officers seized the curling iron and the roll of duct tape from the floor where the defendants were arrested. Officers also seized the vehicle the defendants drove to the storage unit.

### I. Opposition to Defendant McKeever's Motion to Suppress Statements

Defendant McKeever moves to suppress his videotaped - post arrest, post constitutional advice of rights statement, claiming that his statement was not voluntary, but due to police coercion and violated his Miranda[1] rights. This argument is wholly without merit and devoid of any factual basis. *For the Court's evaluation of defendant McKeever's videotaped statement, the government will hand deliver a copy to the Court when the government files its opposition.

Shortly after McKeever was taken into custody, the detectives informed McKeever that he was under arrest and fully advised him of his constitutional rights, which was all captured on videotape. The videotape recording captures the entire exchange with detectives, including their advising McKeever of his constitutional rights, and his freely and voluntarily waiver of those rights, and his subsequent signing of a written waiver of those rights. Specifically, prior to advising McKeever of his rights, the detectives asked McKeever what was his last educational level. The detectives then told McKeever that they could not talk to him until he answered yes to each question

---

[1] Miranda v. Arizona, 382 U.S. 436 (1966).

and initialed each question and sign the bottom of the rights sheet evidencing that he wanted to talk to the detectives at that time.  The rights form listed each of the rights that Miranda declares defendants must know when placed under arrest: (1) that he has the right to remain silent; (2) that any statement he makes may be used as evidence against him; (3) that he is entitled to consult with a lawyer and have a lawyer present during his interrogation; (4) that an attorney will be appointed to represent him if he cannot afford to retain an attorney; and (5) that he may exercise these rights at any point during the interrogation.  Miranda, 384 U.S. at 444, 471.  Defendant McKeever freely and voluntarily signed the rights card acknowledging that he was waiving his constitutional rights and he wanted to talk to the detectives.

Having made his waiver in writing and orally, and voluntarily, willingly, and intelligently, defendant McKeever now claims, without factual support, that his statement was coerced and not voluntary.  When the validity of a waiver of Miranda rights is challenged, the government is required to prove that the waiver was voluntary by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 168 (1986). Although the validity of the waiver is to be determined on a case-by-case basis by examining the totality of the circumstances, North Carolina v. Butler, 441 U.S. 369, 374-375 (1979); United States v. McNeil, 433 F.2d 1109, 1112 (1969), "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of the waiver . . . " Butler, 441 U.S. at 374-375.  Here, as described above,  the evidence will show that the defendant signed an express written waiver of his Miranda rights and he understood those rights, which all was recorded and videotaped.  "The administration of proper Miranda warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled. If the written waiver

is promptly followed by an actual confession, the likelihood that the waiver was valid is often further enhanced." United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988).

The defendant's allegations that his statements were coerced because the detectives "threatening defendant and by misrepresenting the nature of their interrogation" of the defendant are unfounded. A statement is voluntary for purposes of due process so long as the statement is "the product of an essentially free and unrestrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). A statement is involuntary only where the speaker's, "will has been overborne and his capacity for self-determination critically impaired." Id. at 225. Furthermore, for a statement to be suppressed on the ground of involuntariness, the statement must be the product of government overreaching; a defendant's peculiar sensitivity alone does not constitute a constitutional violation by the government. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Here the detectives gave the defendant and accurate summary of why he was arrested and they wanted to hear his version of the facts after a full and fair waiver of his constitutional rights. Defendant fails to proffer any facts which would indicate that his will was overborne. See Rogers v. Richmond, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined"). Connelly, 479 U.S. at 163-64 ( "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). Defendant has pointed to no indication of such conduct in this case. Furthermore, the evidence will show that the defendant's will had not been overborne and his capacity for self-determination had not been critically impaired by the officers. See Schneckloth v. Bustamonte, 412 U.S. at 225-26.

In addition, the defendant argues that somehow the detectives suggested that he would be

released if he talked to them and that by not talking to the officers would lead to detention is totally without merit or factual basis. See Defendant's motion at 3. A "statement made in supposed return for a benefit is not automatically involuntary. Each case turns on an assessment of the peculiar circumstances of the case." United States v. Jackson, 627 F.2d 1198, 1211 (D.C. 1980).

Decisions by the D.C. Circuit have held that the proper judicial focus is on police conduct. In United States v. Bernett, 495 F.2d 943, 965-66 (D.C. Cir. 1974), the majority held: "The language of the self-incrimination clause '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . .,' demonstrates that some form of governmental compulsion is a basic element of an involuntary confession." United States v. Yunis, 859 F.2d 953, 962 (D.C. 1988). Defendant McKeever contends that the detectives actions alleged here -- that somehow the detectives suggested that he would be released if he talked to them and that by not talking to the officers would lead to detention -- amounts to improper coercion. None of these acts taken alone or together amount to coercion. "Generally, the factors for consideration in determining voluntariness include the circumstances surrounding the questioning, the accused's, age, education, and prior experiences with the law, his physical and mental condition at the time the statement was made, other factors showing coercion or trickery, and the delay between the suspect's arrest and the confession." Davis v. United States, 724 A.2d 1163, 1168 (D.C. 1998) (internal citations omitted), cert. denied, 120 S. Ct. 805 (2000). See also, e.g., Bell, 740 A.2d at 964; Beasley v. United States, 512 A.2d 1007, 1015 (D.C. 1986) (adding "duration of the questioning, and any allegations of physical coercion [[], or promises of leniency"; internal citation omitted), cert. denied, 482 U.S. 907 (1987).

The defendant has presented no evidence that the detectives compelled the defendant to make his statement. Indeed, the defendant offers no evidence of physical or verbal threats by the

6

detectives, no display of any weapons, or any disability on the part of the defendant which might have given the detectives some advantage. Without this showing, defendant's claims must necessarily be denied. See United States v. Guerrero, 847 F.2d 1363 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will). In fact, other circuits have ruled that an interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect. See United States v. Brandon, 633 F.2d 773, 777 (9th Cir.1980); United States v. Glasgow, 451 F.2d 557, 558 (9th Cir.1971); Fernandez-Delgado v. United States, 368 F.2d 34, 35-36 (9th Cir.1966). The circumstances in this case do not disclose any overbearing conduct on the part of the detectives nor any promises made or suggested to coerce the defendant and the testimony at the motion hearing will support such a finding. Indeed, there is no evidence that any promises were made to the defendant or that he was subjected to any threats, physical coercion, or protracted interrogation.[2]

In this case, the evidence will show that defendant willingly waived his rights and agreed to talk to the detectives regarding the circumstances of his arrest. Significantly, the defendant is a 34 year old adult and was not mentally impaired. The defendant was read his Miranda rights and he executed a written waiver of them prior to any questions put to him. The recitation of those rights, and defendant's acknowledgment and waiver of them were both recorded orally on videotaped and

---

2 Trickery or a promise of leniency does not necessarily undermine the voluntariness of a confession, so long as the means used are not calculated to produce an untrue statement. See, e.g., Beasley v. United States, 512 A.2d 1007, 1016 (D.C. 1986) (promises of leniency and exaggeration of strength of evidence insufficient to overbear defendant's will).

in writing. Immediately following this waiver, defendant made his statement, *inter alia*, where he admits his participation in the charged crime. The government must only show that "it is more probable than not" that defendant McKeever's waiver of rights was voluntary, id. at 962. The evidence in this case conclusively shows that defendant McKeever freely waived his rights and he did so voluntarily and knowingly. In fact, at no time did the defendant ever decline to talk to the detectives nor did he ever request that he be afforded an attorney nor did the detectives ever coerce the defendant to give a statement in anyway. In fact, there were no promises made to the defendant by the law enforcement agents, or implied inferences by the detectives, and the evidence will show that the defendant was only told of the charges he faced and the maximum sentence he could receive was not in anyway coercive or overborne the defendant's will. Consequently, the defendant's waiver is valid and was taken in an appropriate manner. See also Alston v. Redman, 34 F.3d 1237, 1252-54 (3d Cir. 1994) (holding that Miranda waiver not coerced because of, inter alia, the "limited nature of the promise made by the investigators" to "make a plea recommendation to the prosecutors if [defendant] cooperated fully in the interrogation"); People v. Rufino, 740 N.Y.S.2d 113, 113-14 (N.Y. App. Div. 2002) (holding that officer's statement made before advising defendant of his Miranda rights that "it would be beneficial to [defendant] if he cooperated" did not "constitute a promise of leniency which would render the waiver and statement involuntary"); People v. Belgenio, 559 N.Y.S.2d 375, 375 (N.Y. App. Div. 1990) (holding that officer's statement made before advising defendant of his Miranda rights that "'maybe perhaps we can help you'" did not render Miranda waiver involuntary). Under the above precedent, those claims do not undermine the voluntariness of his waiver and the defendant does not allege facts sufficient to indicate that his statements were involuntary or untrue.

**II. Government's Response to Defendant Benny-Deans's Motion for Severance**

Defendant Benny-Dean moves to sever his case for trial. Because the government moves and intends to fully use co-defendant McKeever's videotaped statement in it's case-in-chief, the government agrees that both cases should be severed at this time to avoid any possible <u>Bruton v. United States</u>, 391 U.S. 123 (1968) issues. The government has carefully reviewed defendant McKeever's videotaped statement and has concluded that his case should proceed first with an immediate trial of defendant Benny-Dean to follow. Because of co-defendants Hopkins and Wallace's anticipated pleas of guilt on July 12, 2013, the government avers that each trial for the remaining defendants will be approximately a total of three days each.[3]

**CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the United States respectfully requests that the Defendants' Pretrial Motions be decided as outlined above.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

BY:      /s/
EMORY V. COLE
Assistant United States Attorney
555 4th Street, N.W. Room 4213
Washington, D.C. 20350
(202) 252-7692
Emory.Cole@usdoj.gov

---

[3] Consistent with the Court's direction regarding defendant Benny-Dean's motion for a Bill of Particulars, and respectfully over the government's objections, the government states the following - that based on the information it has reviewed, the government avers that defendant Benny-Dean participation in the charged conspiracy started on the date of his arrest.